UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COLE D.,[1]                             )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        No. 1:20-cv-00703-SEB-MJD
                                        )
ANDREW M. SAUL,                         )
                                        )
                    Defendant.          )

**REPORT AND RECOMMENDATION**

Claimant Cole D. requests judicial review of the final decision of the Commissioner of

the Social Security Administration ("Commissioner") denying his Social Security applications

for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act")

and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. §§

423(d), 1382. Judge Sarah Evans Barker has designated the undersigned Magistrate Judge to

issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 12.] For the

reasons set forth below, the Magistrate Judge **RECOMMENDS** that the Court **REVERSE** and

**REMAND** the decision of the Commissioner.

**I. Background**

Claimant applied for SSI and DIB in August 2013, alleging an onset of disability as of

July 1, 2009. [Dkt. 7-3 at 75, 80.] Claimant's applications were initially denied on November 1,

---

[1] In an attempt to protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

2013, [Dkt. 7-2 at 133, 138], and again upon reconsideration on January 13, 2014.  [Dkt. 7-3 at 5, 12.]  Administrative Law Judge Patricia Kendall held a video hearing on Claimant's application on October 2, 2015.  [Dkt. 7-2 at 36.]  On May 26, 2016, ALJ Kendall issued her determination that Claimant was not disabled.  *Id.* at 20.  The Appeals Council then denied Claimant's request for review on June 4, 2017.  *Id.* at 1.  Claimant filed a Complaint in this district on July 21, 2017. [Dkt. 7-8 at 153].  On May 1, 2018, the Court granted the parties' Joint Motion for Remand in that case.  [*Id.* at 164.]

ALJ Gladys Whitfield ("ALJ") held post-remand hearings on April 16, 2019, and November 22, 2019.  [Dkt. 7-8 at 77 and Dkt. 11-1.]  On January 2, 2020, the ALJ issued her determination that Claimant was not disabled.  [Dkt. 7-8 at 55.]  Claimant appealed directly to this Court pursuant to 20 C.F.R. § 404.984(d), and timely filed his Complaint on March 3, 2020, seeking judicial review of the ALJ's decision.  [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[2]  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not

---

[2] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

have a "severe" impairment, one that significantly limits his ability to perform basic work activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can perform certain other available work, he is not disabled. 20 C.F.R. § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

Because Claimant's case was remanded by this court for further consideration, the decision of the ALJ becomes the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d). Thus, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir.

3

2019).  Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled.  *Id.*

### III. ALJ Decision

The ALJ first determined that Claimant has not engaged in substantial gainful activity since the alleged onset date of July 1, 2009.  [Dkt. 7-8 at 58.]  At step two, the ALJ found that Claimant has the following severe impairments:  "major depressive disorder—recurrent, moderate; social anxiety/social phobia disorder; and alcohol abuse disorder."  *Id.*  At step three, the ALJ found that "[i]ncluding the claimant's substance abuse, the severity of the claimant's impairments met the criteria" for listing 12.06 (anxiety and obsessive compulsive disorders).  *Id.*  But the ALJ ultimately determined:  "If the claimant stopped the substance abuse, the claimant would not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed" in 20 C.F.R. pt. 404, subpart P, App. 1.  *Id.* at 60.  The ALJ then found that if Claimant stopped abusing alcohol, he would have the residual functional capacity ("RFC")

> to perform a full range of work at all exertional levels but with the following nonexertional limitations:  no detailed or complex tasks.  He can perform simple, routine, repetitive tasks. No more than occasional routine changes in the work place.  Occasional interactions with coworkers and supervisors.  No direct interaction with the general public.  No fast-paced production requirements or assembly line type work.  No tandem tasks or teamwork, as those terms were defined by the vocational expert.  He can tolerate interactions to receive instructions and for task completion of simple, routine, repetitive tasks, that is, short cycle work, where a few routine tasks are performed over and over again according to set procedures, sequence, or pace with little opportunity for diversion or interruption, and where there is little to no room for independent action or judgment in working out job problems.

*Id.* at 61.

At step four, the ALJ found that if Claimant stopped abusing alcohol, he would be able to perform his past relevant work as an office helper. *Id*. at 65. The ALJ proceeded to step five, considering testimony from a vocational expert ("VE"), who indicated that an individual with Claimant's age, education, work experience, and RFC—as determined if Claimant stopped substance abuse—would be able to perform several jobs that exist in significant numbers in the national economy, such as a checker, laundry folder, and classifier/sorter. *Id*. at 66. Finally, the ALJ found that Claimant's substance abuse disorder was "a contributing factor material to the determination of disability because [he] would not be disabled if he stopped the substance abuse," and thus, the ALJ concluded Claimant was not disabled. *Id.*

## IV. Discussion

The central issue in this case is whether substantial evidence supports the ALJ's determination that Claimant is not disabled. The Court addresses Claimant's arguments below.[3]

### A. Reasons for the Relative Weight Given to the Psychologists' Opinions

The record contains the opinions of two state-agency psychologists—Drs. Shipley and Johnson—who reviewed Claimant's records in 2013. They concluded, *inter alia*, that Claimant (1) should be "limited to settings requiring only minimal contact with others"; and (2) "could work with a supervisor who was normally considerate and positive, but would have problems with a supervisor who was often negative, critical, or quarrelsome." [Dkt. 7-2 at 89.] The ALJ gave their opinions "some weight," stating that the opinions were "somewhat consistent with the substantial evidence of record discussed in this section, such as the claimant's presentation at the

---

[3] The Court notes that Claimant has withdrawn one of the arguments he made in his opening brief. *See* [Dkt. 15 at 3].

hearings, activities of daily living (such as the walk to the drug store discussed above), and findings from mental status exams." [Dkt. 7-8 at 63.]  However, the ALJ gave "more weight" to the opinion of testifying medical expert Dr. Thomas, finding that his opinion was "more consistent with such evidence when not accounting for claimant's alcohol use" and that Dr. Thomas "had access to additional evidence." *Id.*  The ALJ further stated the following regarding Dr. Thomas:

> Dr. Thomas, an impartial medical expert that testified at both post-remand hearings, opined that without considering the claimant's alcohol use, the claimant did not meet or equal a listing and had marked limitations in interacting with others and moderate limitations in the other broad areas of mental functioning. He further opined that the claimant's functional limitations include simple, repetitive, routine tasks, only occasional workplace changes, no interaction with the general public, and occasional contact with supervisors and coworkers.  His opinion is given great weight.  He explained that the functional limitations would lower or eliminate the risk that the claimant's symptoms would be exacerbated and assessed the impact of the claimant's alcohol use on his symptoms.  He reviewed nearly all of the medical records and is a board-certified clinical psychologist with many years of experience.  He supported his opinion with explanations, and it is generally consistent with the substantial evidence of record discussed in this decision, such as the claimant's presentation at the hearings, activities of daily living (such as the walk to the drug store discussed above), and findings from mental status exams.  The claimant also had the opportunity to cross-examine him.

*Id.* at 62-63.

Claimant argues that the ALJ failed to sufficiently explain why she gave the state agency psychologists' opinions "some weight" and gave Dr. Thomas's opinion great weight."[4]  The Court disagrees.  The ALJ sufficiently articulated her reasons for giving Dr. Thomas's opinion

---

[4] Claimant finds fault with the fact that the ALJ gave some of the same reasons for giving the state psychologists' opinions "some weight" and Dr. Thomas's opinions "great weight."  The Court sees no inconsistency.  All of the opinions were credited to some extent, and the ALJ gave reasons for that.  The ALJ found some additional factors that applied only to Dr. Thomas and, based on those additional factors, gave his opinions more weight.

more weight, explaining that Dr. Thomas's opinion was based on more information than that of the state agency psychologists.  Indeed, the latter opinions were six years old by the time of the hearings at which Dr. Thomas testified, thus giving Dr. Thomas access to more recent information.  The ALJ also explained that she found Dr. Thomas's opinions to be more consistent with Claimant's presentation at the hearing and other evidence.  The ALJ did not fail to articulate adequate reasons for the relative weight she gave the opinions in question.

     B.  Evaluation of Dr. Thomas's Opinion

Claimant next argues that the ALJ erred by failing to "include in her evaluation of Dr. Thomas's opinions the confusing if not contradictory answers given by Dr. Thomas during his evaluation" regarding Claimant's ability to work around others.  [Dkt. 13 at 22.]  With regard to that topic, Dr. Thomas testified at the first post-remand hearing that he "essentially" agreed with case manager Ryan Ruble's assessment that Claimant "should not be around other people, in other words, he should work in isolated settings, isolated settings away from others; occasional contact—I agree with occasional contact with coworkers and supervisors."  [Dkt. 7-8 at 106-07.] The following exchange then took place between Dr. Thomas and the ALJ:

> Q:  So when you say occasional contact with coworkers, so you're saying that's up to 33 percent?
>
> A:  Yes.
>
> Q:  And—
>
> A:  Less than, you know, 33 percent or less.
>
> Q:  And what was the—well, you said work in isolation, is that—
>
> A:  Away from others.
>
> Q:  And—and that includes coworkers and supervisors?

A: I'm sorry?

Q: Does that include also in isolation from coworkers and supervisors?

A: No, I agree with this that he can have occasional contact with, you know, coworkers.

Q: So when you say isolation to—away from whom?

A: Away from others. I guess I—isolation is—

Q: Is that from the public or—

A: No, it says not around people. This is from Exhibit 15. Not around others, not—

Q: So he can be around others. So he can have occasional interaction with coworkers—

A: He can be around—

Q: and supervisors?

A: In other words, if you're—I mean—all right. I don't want to overstep my bounds into the vocational area, but I was essentially saying that he could have—he could have the—the work situation largely away from others, but if he has to interact with others, it could be occasional—up to occasional and with supervisors occasional.

Q: So what about with the general public?

A: No, no, interaction with the general public. That I believe this excludes—excludes the general public.

***

Q: So when you say work in isolation, can—can the individual be or the claimant—can the claimant be in the proximity of others?

A: Yes, he can.

Q: So when you say isolation, are you meaning they work doing their own task independently without anyone else—him having to really work with others other than the occasional contact with coworkers or supervisors?

A:  Exactly, Judge.

Q:  But they can be in physical proximity with coworkers?

A:  He can be and—well, all right.  Actually, he can be in—he can be in proximity but working largely independently.  In other words, what we're—what I'm trying to do is reduce the social demands.

Q:  Okay.

A:  So I'm not suggesting that he needs to be in a closed room.

Q:  Okay.

A:  I'm trying to reduce the social demands because when—when there's social interaction, there's a demand for a response—

Q:  And so you're trying—

A:  —and that—but that demand is usually immediate when you're interacting with others—

Q:  Right.

A:  —and usually want something from you.

Q:  Okay.  So when you say isolated, you're really talking about the need to have social interaction and have to communicate with others and—but it's not a physical—you're not talking about physically isolated?

A:  That's correct.

Q:  So would you find that a limitation—just a minute.  Do you find that there would be any limitations regarding telephone communication, verbal communication, anything of that nature?

A:  No.

Q:  But as long as there's no interaction with the public; occasional interaction with coworkers and supervisors; I mean, I think—let me summarize this so I understand your limitations to be [sic].  Simple, routine, repetitive tasks; occasional change in the workplace so that's up to 30—33 percent or less—

A:  Okay.

Q:   —is appropriate.

A:   Um-hum.

Q:   The claimant can manage that in your opinion?

A:   That is—that's correct.

Q:   No fast-paced or assembly line type of work.

A:   That's correct.

Q:   You said you work in isolated settings, but you don't mean physical isolation. They can be in the physical proximity of others.

A:   Yes, that's correct.

*Id.* at 107-08, 110-12.   On cross-examination, counsel and Dr. Thomas had the following

exchange:

Q:  And you had said something . . . to the effect of interaction demands a response?

A:  Oh, yeah.  In other words, in social situations for people who suffer from social anxiety, social phobia, they believe or have a sense that people are making immediate demands socially upon them.  In other words, they're sensitive to those social situations and so, you know, I suggested that in my testimony that we want to basically limit that because of the potential of exacerbation of the social anxiety.

***

Q:  So whether it's the public or a coworker or a supervisor, that's going to be the same problem is it not?

A:  Right, and that's why we limited him only to occasional from the supervisor and occasional from the coworkers.

Q:  Well, . . . if he's going to have the same problems, if his social anxieties are going to be exacerbated by any interaction with anybody—

A:  That's why we limit it.

Q:  —and we've—but we've said no interaction—

A:  I mean, well, the problem—right.  The public—but remember coworkers— well, no relate to—because he's in a work situation he'd be familiar with them and for familiar people in a work setting, you know, I think the demand is—is dampened.

Q:  He's not going to be familiar with them from the start, is he?

A:  From the start?

Q:  Yes, when he—when he walks in the door for a job.

A:  No.  Well, I'm just talking just generally.  Just generally in a workplace, you—you become familiar with—in a work setting, you become familiar with the people you work with.

Q:  After—after a certain time.

A:  And so I think that continuates [sic] it—it continuates the demand.  So occasionally—my definition, he could tolerate occasional from coworkers and supervisors.

Q:  Even right—

A:  But not from—but not from the general public.

Q:  Okay.  So day one, hour one, that's supervisor, those coworkers are as strange to him as the public, are they not?

A:  Well, that is true.  That's true.

Q:  And it takes a while—I mean, you have to get through that.

A:  Right.  But I—but I—

Q:  And if you can't get through that—

A:  —but I already testified that I think he should work away from others too.  In other words—and then I also said less than 33 percent of the time so it could go— it could be much less than that in a work setting.  But up to 33 percent of the time, in other words, it could be much less than that in a work setting.  So I predict that he could tolerate occasional contact with coworkers and occasional contact with supervisors.

11

*Id.* at 113-16.

At the second post-remand hearing, the following exchange took place between counsel

and Dr. Thomas:

> Q: And I think last time you talked about that he needed to work in isolated settings, but did not need to be in a closed room; could be in physical proximity to others, but working independently; could have occasional contact with supervisors or coworkers, that correct?

> A: That is correct.

> A: Okay. I'm—I'm having a little trouble reconciling how he could have occasional contact with coworkers and supervisors, but yet be in an isolated setting. Can you help me with that?

> A: Well, I have—in a—in a—in a work setting that is largely isolated. Like in other words, if he's working—if a person—I'm not a vocational expert—

> Q: Right.

> A: —so I can't describe the specific circumstances, but the occasional interaction from time to time if others were asked—if he had to deliver information to others episodically or periodically, have occasional supervision, I don't think that would be intensive and he could still largely be in an isolated setting at a point in other words where he's not required constantly to interact with others.

> Q: When—when you testify—testified before, you said something to the effect that occasional meant up to 33 percent and didn't necessarily mean that [Claimant] could tolerate interacting with others 33 percent of the day, is that correct?

> A: Right, from 0—from I guess 1 percent to up to 33 percent, but certainly, you know, I think if it—if it were 33 percent that that could be—that would be difficult. In other words, you're approaching—you're approaching a level of interaction that he may not be able to tolerate.

> \*\*\*

> A: Well, I think I've already said that I mean I wouldn't want it to be at 33 percent necessarily, but from—as I said, from 0 or 1 percent up to 33 percent.

12

Q: Well, I guess my question is, you, you know, 0 he could tolerate, 33 percent you just said would be difficult—

A: Would be difficult, that's correct, but he could tolerate. In other words, he could function, but I would—I would prefer that it's somewhere less than that, I would.

Q: Okay. And how much less would you think?

A: Well, I think if he—if sometimes, you know, hear the word superficial, and, you know, I would, and I never heard a number assigned to superficial, but I'm certainly comfortable with the word superficial for someone who has the anxiety and the depression, the social anxiety, the mood instability. I'm comfortable with the word superficial.

\*\*\*

Q: Dr. Thomas, we represent to you that in October of 2013, the state agency psychologist, Dr. Shipley, wrote that [Claimant] was "limited to setting requiring only minimal contact with others." Would you agree with that?

A: Yes, I do.

Q: And it kind of ties in with the limitation to superficial contact, does it not?

A: I—I mean minimal I would say possibly is—is very similar to superficial.

Q: Okay. And then Dr. Shipley—Dr. Shipley also wrote that [Claimant] "could work with a supervisor who was normally consideration and positive, but would have . . . problems with a supervisor who was often negative, critical, or quarrelsome." Would you agree with that?

A: I would say that—that that is—that it would not be desirable for him to be in a—in a—you know, such a supervisor would enhance the level of stress.

Q: Okay.

A: I mean the latter who is, you know, who is difficult or—or who is demanding, etc.

\*\*\*

Q: Doctor—doctor, with—you've talked about that [Claimant] is limited to no more than superficial contact with others, that he would be limited to settings requiring only minimal contact with others, and yet in terms of receiving

13

instructions on how to do tasks, that is more than minimal and superficial, is it not?

A:  I think I said up to—I think I said I have a preference for superficial, but I think I said up—I don't think I ever changed about up to 33 percent.  I think he could function up to 33 percent.  I believe that's what I said, but I believe you asked me a question and I said I am, you know, from 0 to 33 percent.  When he reaches up to 33 percent, I think that is more questionable, but I'm comfortable with 0 to 33 percent, but I did use the term—the term has been used superficial in different hearings, but as I said, I never heard specifically from a vocational—or from a judge the—what—exactly what's the perception of a number assigned to superficial.

Q:  Okay.  Forgetting the number part, when—when you say superficial, what do you mean by that?

A:  Like in other words, the—if he's interacting with others, it doesn't require the long sustained in [sic] interaction.  In other words, as someone has information or they go over a series of tasks, they have—whether these are verbally or written and that interaction subsides or is [sic] abates.  That interaction abates.  It's not an interaction that is intensive.  It can occur as I said up to 33 percent.  Those interactions can occur, but I guess what I'm saying is the—the—the period of interaction would be limited and brief.  Does that make sense to you?

[Dkt. 11-1 at 9-12, 18-19, 26-27.]  The following exchange between the ALJ and Dr. Thomas also took place during that hearing:

Q:  So, doctor, I want to ask you a couple of questions.  When you talk about working in isolation, you previously said can be in the proximity of others.  That was from the prior hearing and so would limitations of no tandem tasks or no team work, would that be appropriate in this—

A:  Well, the attorney, you know, I don't have the benefit of—of anybody—I mean I don't have a transcript of what I said—

Q:  Okay.

A:  —and the attorney just—I mean he—when he asked his question, he said I—he said that I said in the hearing he had to be isolation [sic].  Did I say that?

Q:  Well, I think that was mentioned and then I had you to clarify that and you said can be in proximity of others.

14

A: Okay. Well, that's what I agreed to so in other words, I did not say in—I did not say in—in—required isolation. I did not say that.

Q: Well, I'm not saying you didn't say it. I'm saying that upon clarification you said that the individual could or the claimant could be in the proximity of others.

A: I would agree. I would agree with what I said. If I said yes to that, I'll—I also say yes to that today.

*Id.* at 23-24.

As quoted above, the ALJ gave Dr. Thomas's opinion great weight and included in her summary of that opinion that Claimant could have occasional contact with supervisors and coworkers. The ALJ incorporated that limitation into the hypothetical questions she posed to the vocation expert and ultimately into her RFC determination. While Dr. Thomas's testimony was not as clear and consistent as it could have been, and while that could have led the Court to weigh his opinion differently than the ALJ did, the Court may not reweigh the evidence or substitute its judgment for that of the ALJ, *Burmester*, 920 F.3d at 510, and Dr. Thomas's testimony read as a whole does, in fact, provide substantial evidence to support the ALJ's finding that Claimant could interact with co-workers and supervisors occasionally.

Claimant also argues that "the ALJ failed to recognize that Dr. Thomas endorsed the state-agency psychologists' opinion" that Claimant "was limited to settings requiring only minimal contact with others" and testified that "'minimal' is 'very similar to superficial,'" and thus the ALJ erred by not including a limitation to "minimal" or "superficial" contact in her RFC assessment or her hypothetical questions to the VE. [Dkt. 15 at 4.] However, as quoted above, Dr. Thomas explained that by "superficial contact" he meant contact that was "limited and brief"

and was not "intensive."[5]  [Dkt. 11-1 at 26-27.]  In response to questioning by the ALJ, the VE testified that the jobs he identified in response to the ALJ's hypothetical questions did not "require long, sustained interaction with others" or "intensive interaction with others."  [Dkt. 11-1 at 31.]  Accordingly, the VE's testimony supports the ALJ's finding that Claimant could perform the jobs in question even though he could tolerate only superficial interactions with others as defined by Dr. Thomas.

Finally, as Claimant points out, the Appeals Council noted in its remand order that "the State Agency reviewing psychologists also opined that the claimant could work with a supervisor who was normally considerate and positive, but would have problems with a supervisor who was often negative, critical, or quarrelsome.  However, the Administrative Law Judge did not include this limitation in the residual functional capacity or explain why it was not included."  [Dkt. 7-8 at 169.]  Claimant argues that the ALJ failed to remedy this error on remand; the Court agrees. The ALJ gave some weight to the state psychologists' opinions overall.  She gave great weight to Dr. Thomas's opinions overall, and when asked whether he agreed with the opinion in question, Dr. Thomas testified:

> I would say that—that that is—that is would not be desirable for him to be in a— in a—you know, such a supervisor would enhance the level of stress. . . . I mean the latter who is, you know, who is difficult or—or who is demanding, etc.

[Dkt. 11-1 at 19.]  Thus, Dr. Thomas's testimony did not provide a reason to disregard the opinion.  Upon questioning by counsel, the VE testified that "any worker would have difficulty

---

[5] Claimant also points out the Appeals Council stated in its remand order that "occasional" contact "would suggest more than minimal."  [Dkt. 7-8 at 169.]  Dr. Thomas's testimony also addresses that issue, distinguishing between the quantity of contact (occasional, which is up to 33% of the work day) and the qualitative nature of that contact (minimal, or superficial, which Dr. Thomas described as "limited and brief" and "not intensive").

reacting and sustaining" a work situation in which the supervisor was often negative or critical or quarrelsome, and that while "typically you've got a . . . positive supervisor," in the real world "they're not all positive." [Dkt. 11-1 at 36-37.] And, as Claimant points out, however, the evidence of record is that Claimant's difficulty with such a negative supervisor would be greater than that experienced by "any worker"; otherwise it would not have been noted as an issue by the state psychologists. The ALJ noted the opinion in question in her decision; however, once again she did not include it in her RFC or explain why she did not do so, beyond noting the VE's testimony that "a supervisor would have no reason to be critical of, or cause any problems with respect to, an employee as long as the employee was performing their work satisfactorily." [Dkt. 7-8 at 66.] This failure requires remand. *See Vaught v. Berryhill*, 2017 WL 874861, at *2 (S.D. Ind. Mar. 6, 2017) (reversing for similar error and noting that "in the real world, the limitation that one could successfully work only for 'considerate and positive' supervisors would very likely be a significant one"); *Simpson v. Colvin*, 2017 WL 365643, at *5 (S.D. Ill. Jan. 25, 2017) (ALJ erred by failing to account for opinion that claimant required supervision that was "sensitive to his abilities to handle criticism" a supervisor who "broach[ed] their oversight in a way that is sensitive and not insulting and non-directive"). This is especially true in light of the fact that the Appeals Council specifically included the issue in its remand order.

　　C. <u>Assessment of Claimant's Subjective Symptoms</u>

　　Claimant's final argument relates to the ALJ's evaluation of his subjective symptoms. The ALJ's credibility assessment generally warrants "special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). A court, however, has "greater freedom to review credibility determinations based on objective factors . . . rather than subjective considerations." *Briscoe ex*

*rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). If the ALJ's credibility determination does not build an accurate and logical bridge between the evidence and the result, the court cannot let it stand. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Thus, an ALJ must competently explain an adverse credibility finding with specific reasons supported by the record. *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

In determining whether an individual is disabled, an ALJ must consider all of the individual's symptoms, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record. S.S.R. 16-3p. Once an underlying impairment that could reasonably be expected to produce an individual's symptoms is established, an ALJ must evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities. *Id.* Among the factors an ALJ may consider in evaluating the credibility of an individual's symptoms are daily activities, nature of pain, and the use of medications or other treatments. *See* 20 C.F.R. § 404.1529(C)(3). The ALJ may not disregard a claimant's testimony about the persisting and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms a claimant alleges. S.S.R. 16-3p. Instead, the ALJ must resolve any "discrepancies between the objective evidence and self-reports." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). The critical inquiry is whether the ALJ's credibility determination is "reasoned and supported," and it may be overturned only if it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). A credibility determination is patently wrong if it "lacks any explanation or support." *Id.*

Here, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms but also found that Claimant's

18

statements about the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  [Dkt. 7-8 at 62.]  The ALJ's explanation for this finding is as follows:

> As discussed above, the claimant has no more than a marked limitation in the four broad areas of mental functioning.  At a medical appointment in January 2018, the claimant reported no further alcohol use since binging in early December (17F/22).  He denied suicidal thoughts, had improved overall mood, and engaged in appropriate use of limited humor (17F/22).  Mental status exam findings were largely normal and included an anxious/fearful mood, soft-spoken speech, alertness, focused concentration, organized thought processes, appropriate affect, and good insight into his psychiatric condition; no new prescriptions were requested, and his medication regimen was kept the same (17F/22-25).  Treatment notes from July 2019 provide that the claimant was frustrated by the delays in his social security appeal but seemed to be handling it well (28F/1).  It was noted that the claimant was only being seen for medication management services, and mental status exam findings were largely negative and included no suicidal ideations, an anxious/fearful mood, appropriate affect, alertness, organized thought processes, and an appropriately groomed appearance (28F/1-4).  At Centerstone appointments, the claimant generally came alone, and the medical records do not appear to show that he received, or even inquired about, home-based services due to a fear of being out in public and interacting with others (see e.g., 17F/5, 11, 37, 85, 156; 28F/6).
>
> The claimant lived with his mother in the past but currently lives alone (claimant testimony; 6F/5; 10E/1).  The claimant reported in his function report that he is able to do many activities of daily living, including driving, managing money, preparing meals, and household chores, but does not leave the house except to go to medical appointments or go shopping in stores (5E).  Treatment notes from January 2015 provide that the claimant had gone to the movies on a couple of occasions, participated in family gatherings over the Christmas holidays, and was walking/running about four miles per day (9F/14).  At a medical appointment in January 2018, the claimant reported going to the gym several times per week, which helped relieve tension; in December 2018, the claimant reported that he was still working out several times per week (17F/1, 22).  The claimant testified that when he typically gets alcohol, including in the early spring of 2019 (he was alone during that trip), he walks from his home (he has lived there since 2014) to a drug store that is five minutes away (claimant testimony).  The claimant testified that his mother accompanies him essentially everywhere he goes, but the claimant testified that he does leave his home alone to purchase alcohol.

[Dkt. 7-8 at 62.]  The Court agrees with Claimant that the ALJ's explanation does not provide support for her rejection of Claimant's testimony that he suffers from disabling social anxiety. None of the activities listed—such as walking five minutes to a drug store to purchase alcohol or going to a gym[6]—contradict Claimant's testimony.  The ALJ's finding regarding Claimant's subjective symptoms lacks an adequate explanation with specific reasons supported by the record and must be remedied on remand.

## V. Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and **REMANDED** for further proceedings.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

SO ORDERED.

Dated:  1 DEC 2020

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

---

[6] Claimant testified that "I have a swiping card [to get in the gym] where I can just swipe in and I wear headphones and a hat so nobody ever—nobody ever addresses me[.]"  [Dkt. 11-1 at 48.]

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.